# FRANK CHRISTMANN v. GREAT NORTHERN RAILWAY COMPANY.[1]

July 3, 1930.

No. 27,857.

*A. L. Janes, George Hoke* and *H. H. Sullivan,* for appellant.
*Alphonse A. Tenner,* for respondent.

OLSEN, C.

Appeal by defendant from an order denying its alternative motion for judgment or a new trial.

[1]Reported in 231 N. W. 710.

On January 13, 1928, the plaintiff suffered an injury, consisting of a bruise on the calf of his right leg. He was then and had been for some five years in the employ of the defendant as a car man and was working at the time with three other employes dismantling old freight cars outside of defendant's car shop at St. Cloud in this state. He brings this action to recover damages for serious ailments and disability which he claims have resulted from the comparatively slight injury. He recovered a verdict for $17,300.

The questions presented relate to the sufficiency or insufficiency of the evidence and to the denial of defendant's motions for a directed verdict and for judgment notwithstanding the verdict or, in the alternative, for a new trial. Briefly stated, the questions presented are whether there is evidence sufficient to sustain the verdict of the jury on the following points:

(a)  That the defendant was negligent and thereby caused the injury to plaintiff.

(b)  That plaintiff's subsequent ailments and disability were caused by the injury suffered by him on January 13, 1928.

(c)  That plaintiff had not assumed the risk.

(d)  That the release given by plaintiff on October 4, 1928, be set aside.

(e)  That the amount awarded by the verdict is not excessive.

These are primarily questions of fact. The review here is limited to the inquiry whether there is evidence reasonably sufficient to sustain the findings of the jury on these issues as determined by its verdict. In other respects fact questions were for the jury and the trial court.

■ Plaintiff was working under a freight car, which was being dismantled, with his right leg extending back of him on the ground out beyond the side of the car. Two of the men working with him were on top of the car ripping off boards. One man was inside the car ripping up the floor. Plaintiff testified that he signaled to the men on top of the car to let them know he was going to work underneath. The men deny that they saw any such signal. There is also some evidence of a custom to give warning by men on top

of a car to those below before dropping or throwing down any heavy object. This custom is denied by other witnesses. One of the men on top of the car dropped or threw a board in such a way that it struck plaintiff's leg and caused the injury referred to. That the dropping of the board caused a bruise and injury to plaintiff's leg is conceded.

Under our statute, G. S. 1923 (1 Mason, 1927) §§ 4934, 4935, we have adopted the provisions of the federal employers liability act as to the liability of carriers for injury to employes caused by the negligence of fellow servants and the rule that contributory negligence goes only to reduction of damages in such cases. It was a question for the jury in this case whether the dropping or throwing of the board was an act of negligence by a fellow servant.

■ The bruising of plaintiff's leg caused some swelling, discoloration, and congestion of blood in the calf of the leg and pain in the leg, hip and back. He continued to work that day and the next, applied some home treatment, then consulted defendant's physician, continued to work thereafter but was given lighter work, laid off for a few days, and again continued his work. The swelling and discoloration gradually disappeared, and after some weeks he was able to work without pain in the leg. He claims that there was some weakness and stiffness, that the leg dragged, and that there was continuance of pain in the hip and back. About April 16 he was laid up for three days with influenza or grip. He again worked until April 27. He claims he then suffered pain in the left hip and left leg and weakness in both legs so that he was unable to work. He returned to work May 8 and worked until May 16. On that day he claims to have suffered sudden and severe pain in the left hip and leg so he could not work, and on the next day he had what is referred to as a stroke in the left leg and very severe pain. He has been disabled from that time on.

Defendant concedes in its brief that at the time of the trial and for a long time prior thereto plaintiff was disabled so that he could not work; that he was suffering from neuritis of the anterior crural nerve on the left side, the nerve controlling the left leg, which had produced a tenderness in the sacro-iliac joint and an atrophy of the

left leg. The dispute is whether this condition was caused by the accident and injury to the calf of the right leg, by influenza, or by some other cause.

Plaintiff and his wife testified to a sequence of symptoms and events which had some tendency to show continuance of ailments from the time of the accident and some causal connection between the accident and the disability. Three physicians, called as witnesses by plaintiff, gave their opinion that the accident was the primary cause, or a cause, of the disability; that the injury to the right leg and resulting partial disability and lowered vitality, in connection with plaintiff's continuance of work during the winter, caused such additional weight and strain on the left side and leg as to result in disease and injury to the nerve mentioned and in the disability following. Six physicians, called as witnesses by defendant, testified that in their opinion, the inflammation and disease of the nerve was caused by an infection of some type as distinguished from a physical injury; that plaintiff's disability is not a result of the injury to the right leg on January 13, 1928, but of an infection from the influenza or grip in April of that year, or from some focal point in the body such as the teeth, gums, sinuses, gall bladder, or intestines. The conflict in the evidence presents a fact question. We cannot, except to a very limited extent, pass upon weight or preponderance of the evidence. The finding of the jury on this issue is sufficiently sustained.

■ The question of assumption of risk was a fact question for the jury.

■ Plaintiff signed a release of claim on October 4, 1928. He seeks to have it set aside on the ground of deceit and fraud on the part of defendant's claim agent. Plaintiff was at the time in a hospital in Minneapolis. He testified, in substance, that the claim agent offered to pay him $500 to help him out and help care for his family; that there was no discussion as to the amount of damages or final settlement; that the agent told him they would wait and see what the result of his ailment would be and would then make settlement; that he was asked to give a receipt and signed several papers; that the paper which turned out to be the release was read to him

by a nurse; that she read it rapidly and he did not hear all of it and did not understand it; that a draft for the $500 was given to him; that the next day he had another patient at the hospital read and explain the release and found out what it was; that after he found out it was a release he decided not to cash the draft and has not cashed it; that he relied upon the statements of the claim agent in signing the paper and would not have signed it if he had known it was a release. There is evidence on the part of the defendant, by the claim agent, nurse, and another patient at the hospital that the release was read and explained to and understood by the plaintiff. Plaintiff is a laborer. His language in testifying is somewhat confused and imperfect but does not indicate lack of ordinary intelligence. He does claim that he was suffering at the time; that the claim agent or nurse roused him from sleep and that he was confused.

While strongly contradicted, the jury could nevertheless find plaintiff's version as to the release to be true, and its finding cannot be held to be without reasonable support in the evidence.

■ The verdict is claimed to be excessive. Plaintiff's disability at and up to the time of the trial is not disputed. There is evidence that the disability is probably permanent; that if there is any improvement it will be very slow and not a complete recovery. Plaintiff was 49 years of age, was steadily employed and earning about $105 per month. There is evidence of much pain and suffering. The trial court has approved the verdict. We cannot disturb it as being excessive.

Order affirmed.

STONE, J. (dissenting).

There is no doubt that plaintiff suffered an occupational injury for which defendant should make compensation. There is no question either that the evidence establishes liability upon the ground of negligence. But there is a serious one whether defendant is legally liable for all the harm that has come to plaintiff since the accident. His case was tried and went to the jury upon the theory that he had become a physical and mental wreck. His mental con-

dition had gone to the point where, according to his own witnesses, he is a paranoiac, hopelessly so. I question whether, to that extent, the evidence, taken as a whole and properly weighed, warrants a recovery.

The medical testimony for plaintiff is fairly illustrated by that of Dr. Rees, who says that the original accident "disabled in a large measure his right leg and caused pain and suffering and some disability" and that "with the continuation of being up and about in spite of that injury, with the necessity, as he did, of continuing at work, with the abnormal physical fatigue that would result from that, and his suffering with the exposure of the weather, being in midwinter" led to his present condition. That testimony must include, implicitly, as one of the misfortunes that came to plaintiff after the accident an attack of flu. To the infection resulting from that the doctors who testified for defendant ascribe the neuritis which was the principal ailment from which plaintiff was suffering at the time of the trial. There was nothing then much wrong with the right leg. The left leg was the member principally attacked by the neuritis, and plaintiff's condition is mainly attributable, all the doctors agree, to that neuritis. I have extreme difficulty, even on the basis of the medical testimony for plaintiff, in justifying the jury's conclusion that *all* of plaintiff's unfortunate condition at the time of the trial was attributable to the accident to his right leg.

But putting that question aside, there is, from the standpoint of this decision as a precedent, a much more serious one. It has to do with the contract of settlement which is avoided by the jury's verdict. Plaintiff's story, to the effect that the $500 received for the release was understood by him to be a mere loan, is clearly an afterthought, a defense "framed" after others had come to his assistance. If it had been a loan and he had so understood it at the time, there was no occasion for any delay in cashing his check. So that delay works even more against plaintiff's theory than it does for it.

The release was accompanied by the usual duplicate voucher and contained this statement:

"I fully understand that I can make no further claim against the company even though my injuries may be more serious or different

than I now know or understand them to be and that the sum of Five Hundred dollars is all I am to receive."

It was signed by plaintiff in the presence of his nurse and Howe, defendant's claim agent. Indorsed on the release in the handwriting of Marie Ostrom, one of plaintiff's nurses, is this statement:

"I have read this release to Frank Christmann and he says he, fully understands he can make no further claim against the company even though his injuries may be more serious or different than he now knows or understands them to be and that the sum of five hundred dollars is all he is to receive."

That was signed not only by Miss Ostrom but also and again by plaintiff himself. It is confirmed by the testimony of Miss Ostrom. She testified directly and circumstantially to the transaction as she had recorded it in her own handwriting. Her testimony was not denied by plaintiff.

There was another witness of the transaction—one Baldwin, himself a railroad man, then a patient in the hospital and occupying the second bed from plaintiff's, who, he says, was at the time "sitting up on a chair right along beside" his bed. He says there was no talk at all of a loan but only "about a settlement." He says that he heard Miss Ostrom "read the paper over twice to Mr. Christmann, and when she read it over the second time Mr. Howe asked him if he understood it when she gets through reading it" and Christmann replied that he did "the last time she read it." Thereafter, Mr. Baldwin testifies, plaintiff showed him the draft and "said he wondered if there was any way he could get more money if he didn't cash it. * * * He thought he might get more money if he didn't cash that draft."

The case shows plainly enough that plaintiff has been quite successful in finding a way of getting more money. And it is against the method, successfully adopted, that I protest. Of course and on general ethical principles many releases procured from injured people should be avoided. But the fact remains that they are contracts and when fairly and honestly entered into should not be lightly set aside. Courts give no aid to the cause of justice when

they permit them to be escaped on such flimsy and utterly transparent ground as that upon which plaintiff's case stands. Taking the evidence as a whole, I think it falls short as matter of law of the amount and kind of proof required to avoid a written contract. If releases may be so easily avoided, other written contracts must be escapable in the same manner. Should they become so, there will be little or no assurance attending their obligation.